CLEAR CHANNEL OUTDOOR INC., A DELAWARE CORPORATION; Viacom Outdoor Inc., a Delaware corporation; National Advertising Company, a Delaware corporation, Plaintiffs–Appellees,

v.

CITY OF LOS ANGELES; Angeles Department of Building & Safety; David R. Keim, in his official capacity as Chief of the Code Enforcement Bureau of the Los Angeles Department of Building & Safety, Defendants–Appellants.

No. 02–56947.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 7, 2003.

Filed Aug. 15, 2003.

Michael L. Klekner, Esq., Los Angeles, CA, for the defendants-appellants.

Richard B. Kendall, Esq., Los Angeles, CA, for the plaintiffs-appellees.

Before: SILVERMAN, W. FLETCHER, and RAWLINSON, Circuit Judges.

## OPINION

SILVERMAN, Circuit Judge.

The City of Los Angeles, its Department of Building and Safety, and the Chief of

the Department's Code Enforcement Bureau appeal the district court's order granting the motion of Clear Channel Outdoor, Inc., Viacom Outdoor, Inc., and National Advertising Company for a preliminary injunction enjoining the City from implementing ordinances that provide for the inspection of off-site billboards and the assessment of a fee to cover the cost of that inspection. The district court had jurisdiction under 28 U.S.C. § 1331, and this Court has jurisdiction under 28 U.S.C. § 1292(a)(1). Because we find it unlikely that the advertising companies will prevail on their First Amendment claims, we vacate the preliminary injunction.

## I. Factual and Procedural Background

The Los Angeles Municipal Code regulates exterior signs in the City. *See* L.A.M.C. § 91.6201 *et seq.* In so doing, the Code differentiates between "Off–Site Signs" and "On–Site Signs." An "Off–Site Sign" is defined as "a sign which displays any message directing attention to a business, product, service, profession, commodity, activity, event, person, institution or any other commercial [or non-commercial] message, which is generally conducted, sold, manufactured, produced, offered or occurs elsewhere than on the premises where such sign is located." L.A.M.C. § 91.6203.[1] An "On–Site Sign" is "[a] sign that is other than an off-site sign." *Id.*

On February 8, 2002, the Los Angeles City Council passed Ordinance No. 174442, which established the "Off–Site Sign Periodic Inspection Program." Ordinance No. 174442 subjects all off-site sign structures to regular inspection and requires the person in control of an off-site sign structure

to pay an annual fee for inspection. After inspection, each off-site sign structure will be issued an inspection permit, and the Department of Building and Safety will create and maintain an inventory of all inspected off-site sign structures. Ordinance No. 174736, passed on July 23, 2002, created a trust fund into which the annual inspection fees would be paid, set the first year's fee at $314, and set monetary penalties for failure to pay the fee.

On September 27, 2002, three outdoor advertising companies filed the instant action against Appellants, alleging that the City had "imposed a new, content-based fee on certain speech," and thereby abridged their right to free expression and equal protection of the laws under the First and Fourteenth Amendments.[2] The complaint sought declaratory and injunctive relief, and the advertising companies filed a motion for a preliminary injunction on October 7, 2002.

On October 28, 2002, the district court conducted a hearing on the application for a preliminary injunction, and two days later granted the injunction. The district court concluded that the outdoor advertising companies had stated a colorable First Amendment claim because the inspection ordinances (1) favored commercial speech over noncommercial speech; (2) impermissibly differentiated between types of noncommercial speech; (3) impermissibly differentiated between types of commercial speech; and (4) were unconstitutionally vague.

This appeal timely followed.

---

1. The bracketed language ("or non-commercial") was removed by Ordinance 175151, passed by the Council on March 14, 2003, and effective May 12, 2003. The effect of the amendment is discussed *infra* at p. 814–815.

2. Although the City's differentiation between on-site and off-site signs may be analyzed under the equal protection doctrine, the district court issued its preliminary injunction solely on First Amendment grounds.

## II. Analysis

### A. Standard of Review

 This court generally reviews a district court's decision to issue a preliminary injunction for abuse of discretion. *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 730 (9th Cir.1999). In issuing a preliminary injunction, a district court abuses its discretion "by basing its decision on either an erroneous legal standard or clearly erroneous factual findings." *Id.* (citation omitted). A district court's decision is based on an erroneous legal standard if: "(1) the court did not employ the appropriate legal standards that govern the issuance of a preliminary injunction; or (2) in applying the appropriate standards, the court misapprehended the law with respect to the underlying issues in the litigation." *Id.* (citing *Sports Form, Inc. v. United Press Int'l, Inc.*, 686 F.2d 750, 752 (9th Cir.1982)).

 The standard for granting a preliminary injunction balances the plaintiff's likelihood of success against the relative hardship to the parties. To obtain a preliminary injunction, a party must demonstrate

> either: (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor.... These two alternatives represent "extremes of a single continuum," rather than two separate tests ... Thus, the greater the relative hardship to [the party seeking the preliminary injunction,] the less probability of success must be shown.

*Id.* at 731 (citation omitted).

 In addition, "the fact that a case raises serious First Amendment questions compels a finding that there exists the potential for irreparable injury, or that at the very least the balance of hardships tips

sharply in [favor of the party alleging First Amendment injury]'" *Sammartano v. First Judicial Dist. Ct.*, 303 F.3d 959, 973 (9th Cir.2002) (citations omitted).

### B. Discussion

#### 1. Impact on Non–Commercial Speech

 The district court concluded that the inspection provisions of the new ordinance were content-based because, in order to determine whether a sign is "on-site" or "off-site," one must look at the message on a given sign, and whether it refers to goods or services provided on the premises or somewhere else. The district court reasoned that "a noncommercial sign is more likely to fall within the off-site sign definition[ ] because such signs are less likely than a commercial sign to relate to the site on which the structure is located." Order at 9. As a result, the inspection ordinances "impermissibly burden certain types of noncommercial speech based on content alone." *Id.* at 11.

The district court's analysis of the inspection ordinances' effect on noncommercial speech is incomplete in at least three respects. *First*, the district court's analysis overlooks considerable precedent upholding the viability of the on-site/off-site distinction. *Second*, that analysis appears to be based on a misunderstanding of how the on-site/off-site distinction arises. *Third*, to the degree the on-site/off-site distinction might implicate noncommercial speech, the recent amendment to the ordinance removes a potential problem.

As the City correctly argues, there is nothing novel or constitutionally infirm about its use of the on-site/off-site distinction. The Supreme Court, the Ninth Circuit, and many other courts have held that the on-site/off-site distinction is not an impermissible content-based regulation. In the leading Supreme Court case on the regulation of outdoor advertising, the plu-

rality opinion found it permissible to distinguish between on-site and off-site commercial signs, while declaring a San Diego ordinance unconstitutional because of its general ban on noncommercial signs. *See Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 511–14, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981).[3] There is no support in *Metromedia* for the proposition that the on-site/off-site distinction *itself* places an impermissible content-based burden on noncommercial speech.

We have relied on *Metromedia* to uphold sign ordinances that distinguish between on-site and off-site signs when that distinction does not also prevent the erection of onsite noncommercial signs. *See Ackerley Communications of the Northwest, Inc. v. Krochalis,* 108 F.3d 1095 (9th Cir.1997); *Outdoor Systems, Inc. v. City of Mesa,* 997 F.2d 604 (9th Cir.1993). In *Outdoor Systems,* we considered the sign ordinances of two Arizona cities, both of which distinguished between on-site and off-site signs, and examined their impact on both commercial and noncommercial speech. We concluded the ordinances were content-neutral with respect to noncommercial speech because both ordinances contained a so-called "substitution clause" that permitted any otherwise properly erected sign to contain noncommercial messages in lieu of any other message. *See id.* at 612.

In *Outdoor Systems,* the billboard owners argued, as the advertising companies do here, that greater restrictions on off-site signs would have greater impact on noncommercial messages, but this Court rejected as "speculation" the claim that the ordinance would have "the effect of preferring" commercial speech, noting that whatever effects the ordinance might have "would be the result of decisions made by[the] individual sign owners." *Id.* Under *Outdoor Systems,* the key consideration is whether a sign ordinance is neutral with respect to noncommercial messages, and that neutrality is maintained by the substitution clause which allows noncommercial messages on either on-site or off-site signs.

Appellees' arguments to the contrary are based on the mistaken impression that the fee would be imposed on non-commercial messages, whereas in reality the fee is imposed on offsite sign-structures that may or may not carry a non-commercial message.[4] Appellees' briefing raises the specter of a faceless bureaucrat who, for the purposes of deciding whether a given sign-structure is subject to the inspection program, must scrutinize the content of each sign anew. In reality, the process is far more constitutionally benign. An applicant seeking to erect a sign chooses one designation or the other based on projected use. If the sign-structure will be limited to advertising a good or service provided on the premises, an "on-site" permit is requested; if the sign-structure will be available for a variety of messages, an "off-site" permit is requested.

A sign's status as "off-site" or "on-site," then, is primarily a function of the permittee's choice, not the government's classification.[5] Contrary to Appellees' claim that

---

**3.** Although the endorsement of the on-site/off-site distinction is found in the plurality opinion, it is clear that a majority of the Court agreed on this issue.

**4.** Appellees are large advertising companies who lease space on their sign-structures to a variety of clients who post a variety of messages.

**5.** It is true that the inspection program may turn up *illegally*-erected signs, and to bring these into compliance it would be necessary to determine whether an on-site or off-site permit is required. But the permitting process is not the subject of this action.

the ordinances disfavor noncommercial speech, the on-site/off-site distinction is, in effect, a distinction between sign-structures dedicated to a limited and local purpose and those made available for a wider range of communicative purposes. The ordinances are neutral with respect to noncommercial speech because the substitution clause guarantees that political and other noncommercial messages are not limited to one or the other type of sign-structure.[6]

Any remaining concern that the on-site/off-site distinction works a content-based discrimination against noncommercial speech is allayed by the recent amendment striking the words "or noncommercial message" from the definition of "Off–Site Sign" in L.A.M.C. 91.6203. This small change is important because it makes it impossible that a noncommercial sign would be designated an "off-site" sign for the purposes of inspection, even if that sign structure is, in the ordinary sense of the term, off-site. In effect, the amendment creates an exemption for noncommercial off-site signs. Therefore the inspection program does not impermissibly favor commercial over noncommercial speech.

2. Impact on Commercial Speech

 For more than twenty years, courts have determined the validity of government restrictions on commercial speech by applying a four-part test that asks: (1) whether the regulated commercial speech concerns lawful activity in a manner that is not misleading; (2) whether the restriction seeks to implement a substantial governmental interest; (3) whether it directly advances that interest, and (4) whether it reaches no further than necessary to accomplish the given objective. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563–66, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).

Here, the district court acknowledged that the goals of improving traffic safety and the general aesthetics of the City are "substantial government interests," but it questioned whether the inspection ordinances were the most direct approach to solving the City's problems, and concluded that a program aimed at regulating only off-site signs would not "directly or materially advance" the City's interests because off-site signs accounted for only 2.5% of all the estimated signs within the city limits.

The district court's analysis is flawed, however, because it employs a stricter standard than the "reasonable fit between the ends and the means" test set forth in *Outdoor Systems*. *See* 997 F.2d at 610–11 (concluding that there was a "reasonable fit" between the Arizona sign ordinances and their goals). An inspection program that targets only a subset of all signs is not necessarily inconsistent with the goals of safety and aesthetics for the same reasons that it is permissible to distinguish between on-site and off-site signs in the first place:

> [W]hether onsite advertising is permitted or not, the prohibition of offsite advertising is directly related to the stated objectives of traffic safety and esthetics. This is not altered by the fact that the ordinance is underinclusive because it permits onsite advertising .... [T]he city may believe that offsite advertising,

6. A group seeking to erect a political sign might well prefer to place its messages on a large billboard beside a busy highway, but the inspection ordinances do not place the burden of the inspection fee on large roadside billboards *because* they might carry political messages. The substitution clause means that such messages can be placed on on-site signs as well, whether the owner of the on-site sign posts such a message himself or leases the right to do so to others.

with its periodically changing content, presents a more acute problem than does onsite advertising .... San Diego has obviously chosen to value one kind of commercial speech—onsite advertising—more than another kind of commercial speech—offsite advertising. The ordinance reflects a decision by the city that the former interest, but not the latter, is stronger than the city's interests in traffic safety and esthetics.... As we see it, the city could reasonably conclude that a commercial enterprise—as well as the interested public—has a stronger interest in identifying its place of business and advertising the products or services available there than it has in using or leasing its available space for the purpose of advertising commercial enterprises located elsewhere.

*Metromedia,* 453 U.S. at 511–12, 101 S.Ct. 2882 (citations omitted). In sum, if an inspection program is designed to advance a valid City interest—reducing the number of dangerous, non-conforming signs—it should not matter that it is underinclusive. Moreover, as Appellees all but concede, the City could constitutionally pass an ordinance banning all commercial off-site signs. It makes little sense, then, to argue that adopting a program that merely subjects those signs to inspection would be unconstitutional.

Appellees point to evidence in the record indicating that on-site signs are more likely to be in violation of the law. The City contends in turn that on-site structures are less likely to pose a danger because of the presence of an ongoing business and its proprietor. At this stage in the litigation, neither side has presented substantial evidence about comparative compliance rates as between on-site and off-site signs. Such figures would in any event be potentially misleading because the two kinds of signs are subject to different requirements, and an out-of-compliance billboard may well pose greater dangers than an out-of-compliance on-site sign. In any event, under *Metromedia,* the City need only show that the goal of bringing off-site signs into greater compliance with building codes is itself legitimate.

3. Vagueness

█ The district court also agreed with Appellees that the ordinance was unconstitutionally vague in light of the difficulty of classifying any given hypothetical sign as on-site or off-site. As discussed above, however, the designation of a sign as on-site or off-site is not a classification that the City makes in the first instance for the purposes of inspection; rather it is a regulatory distinction made at the permitting stage that reflects the stated purpose of the party seeking a sign permit.

Appellees correctly note that the doctrine of unconstitutional vagueness is designed to insure sufficient notice and to protect against undue discretion in the application of the inspection program. *See City of Chicago v. Morales,* 527 U.S. 41, 52, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999). Appellees, and others with lawfully-erected signs, have sufficient notice that their signs are subject to the program because they applied in the past for off-site sign permits. Despite Appellees' hypotheticals, the inspection process is not subject to City employees' unfettered discretion because the distinctions central to its implementation—"commercial"/"non-commercial," "on-site"/"off-site"—have been sufficiently explicated in case law. *See Outdoor Systems,* 997 F.2d at 613 (holding that potential difficulty of classify—11507 ing billboards does not render regulations unconstitutionally vague).

*III. Conclusion*

Appellees are not likely to succeed on the merits of their First Amendment challenge insofar as that challenge is based on

the on-site/off-site distinction. It is undisputed that the City's sign ordinance has been in place for some time, and Appellees have offered no evidence that the on-site/off-site distinction has been proven unworkable. If the inspection program is unconstitutional, so is the entire permitting process it seeks to enforce. That kind of broad challenge is beyond the scope of this action, and would in any event run afoul of Supreme Court and Ninth Circuit precedent.

Appellees have offered no specific evidence that the inspection fee would burden their speech unconstitutionally. In the end, the inspection ordinances are the equivalent of an increase in the permit fee for off-site signs, and Appellees have not established how the City's decision to impose such an increase threatens a constitutional harm. We therefore VACATE the district court's preliminary injunction.