**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

THE LANDS COUNCIL; OREGON
NATURAL RESOURCES COUNCIL;
HELLS CANYON PRESERVATION
COUNCIL, an Oregon nonprofit
corporation; SIERRA CLUB, a
California corporation,
　　　　　　*Plaintiffs-Appellants,*

　　　　　　v.

KEVIN MARTIN, Forest Supervisor
of the Umatilla National Forest,
U.S. Forest Service; UNITED
STATES FOREST SERVICE,
　　　　　　*Defendants-Appellees,*

　　　　　　and

AMERICAN FOREST RESOURCE
COUNCIL, an Oregon corporation;
BOISE BUILDING SOLUTIONS
MANUFACTURING L.L.C., a
Washington limited liability
company; DODGE LOGGING, INC., an
Oregon corporation,
　*Defendants-Intervenors-Appellees.*

No. 06-35781

D.C. No.
CV-06-00229-LRS

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Lonny R. Suko, District Judge, Presiding

Argued and Submitted
February 5, 2007—Seattle, Washington

Filed February 12, 2007
Amended March 2, 2007

2371

Before: Susan P. Graber, Richard A. Paez, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Graber

**COUNSEL**

Ralph O. Bloemers, Cascade Resources Advocacy Group, Portland, Oregon; Karen Lindholdt, University Legal Assistance, Spokane, Washington, for the plaintiffs-appellants.

David C. Shilton, U.S. Department of Justice, Environment and Natural Resources Division, Washington, D.C., for the defendants-appellees.

Scott W. Horngren, Haglund Kelley Horngren Jones & Wilder, LLP, Portland, Oregon, for the defendants-intervenors-appellees.

**ORDER**

Defendants-Appellees' letter dated February 15, 2007, requesting that the court strike or correct portions of the opinion is construed as a petition for panel rehearing and is ordered filed. The mandate issued February 12, 2007, is

recalled to allow the court to rule on the petition for panel rehearing.

The Opinion filed on February 12, 2007, is amended as follows:

On slip opinion page 1951, lines 17-18, change "Indeed, the Forest Service's own expert testified" to "For example, Intervenors' expert, on whom the district court relied, testified".

On slip opinion page 1952, line 9, change "given by the Forest Service's own expert," to "given by Intervenors' expert,".

With these amendments, the petition for panel rehearing is DENIED. The mandate shall reissue forthwith.

**OPINION**

GRABER, Circuit Judge:

Plaintiffs The Lands Council, Oregon Natural Resources Council, Hells Canyon Preservation Council, and Sierra Club, which are environmental organizations, appeal the district court's denial of a preliminary injunction to halt the implementation of several United States Forest Service post-fire logging sales in the Umatilla National Forest. American Forest Resource Council, Boise Building Solutions Manufacturing, L.L.C., and Dodge Logging, Inc., which are a forestry advocacy organization and logging companies, join Defendants (the Forest Service and the Forest Supervisor of the Umatilla National Forest) as intervenors. We hold that the district court did not abuse its discretion in denying a preliminary injunction on Plaintiffs' claims under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370, but

that the district court did abuse its discretion, by applying an erroneous legal standard, in denying a preliminary injunction on Plaintiffs' claims under the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600-1614.

FACTUAL AND PROCEDURAL HISTORY

In August 2005, a forest fire named the "School Fire" burned approximately 51,000 acres in southeastern Washington, including 28,000 acres of the Umatilla National Forest. Soon thereafter, the Forest Service began preparations for the School Fire Salvage Recovery Project to harvest dead and dying trees located within the burned areas of National Forest lands.[1] After two rounds of public comments, the Forest Service released the Final Environmental Impact Statement ("EIS" or "School Fire EIS") on July 10, 2006, and issued a Record of Decision on August 14, 2006.

The School Fire EIS considered three alternatives: Alternative A contemplated no action; Alternative B permitted salvage logging on 9,423 acres; and Alternative C permitted salvage logging on 4,188 acres. The Forest Service chose Alternative B, which includes logging on portions of two uninventoried roadless areas, known informally as West Tucannon and Upper Cummins Creek, each of which contains between 1,000 and 5,000 acres.

Because trees that are damaged or destroyed by fire depreciate in value quickly, the Forest Service Chief issued an Emergency Situation Determination pursuant to 36 C.F.R. § 215.10. That Determination authorized immediate logging in three designated areas, premised on the prediction that "a delay would result in a potential loss of value of $1,547,000 to the Federal Government." The three sales—the Milly, Oli,

---

[1] The project also includes construction of temporary roads and harvesting of "danger trees." Danger trees are trees that present a risk to public safety, such as trees that are likely to fall on a road or building.

and Sun Salvage Timber Sales—are located in the most severely burned areas of the forest. Together they comprise 3,674 acres, or slightly more than one-third of the total acreage scheduled for salvage logging under the EIS.

On August 15, 2006, one day after the issuance of the Record of Decision, Plaintiffs filed suit, alleging violations of NEPA and NFMA. The following day, Plaintiffs filed a motion for a temporary restraining order and preliminary injunction concerning the Milly, Oli, and Sun Sales. After briefing and oral argument, the district court denied Plaintiffs' motion. They immediately appealed to this court, arguing that the district court abused its discretion in denying a preliminary injunction.[2]

## STANDARDS OF REVIEW

A preliminary injunction is appropriate when a plaintiff demonstrates "either: (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in [the plaintiff's] favor." *Clear Channel Outdoor Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003) (internal quotation marks omitted). These two options represent extremes on a single continuum: "the less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc) (per curiam). Alternatively, we have stated the general test as requiring a plaintiff to establish

---

[2]Plaintiffs also had filed an emergency motion before this court under Ninth Circuit Rule 27-3, seeking an injunction pending appeal. A divided panel denied that motion in an unpublished order on September 18, 2006. Although logging in the sales areas has now commenced, the parties agree that logging will not be completed until the summer of 2007. This case is therefore not moot.

"(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases)." *Johnson v. Cal. State Bd. of Accountancy*, 72 F.3d 1427, 1430 (9th Cir. 1995) (internal quotation marks omitted).

We review for abuse of discretion a district court's decision to grant or deny a preliminary injunction. *Sw. Voter*, 344 F.3d at 918. This review is "limited and deferential," and "[w]e do not review the underlying merits of the case." *Id.* (internal quotation marks omitted). But the district court "necessarily abuses its discretion when it bases its decision on an erroneous legal standard or on clearly erroneous findings of fact." *Playmakers LLC v. ESPN, Inc.*, 376 F.3d 894, 896 (9th Cir. 2004) (internal quotation marks omitted).

## DISCUSSION

A.  *NEPA Claims*

Plaintiffs contend that the district court abused its discretion by holding that the Forest Service adequately analyzed and disclosed the effects of logging in the West Tucannon and Upper Cummins Creek roadless areas. According to Plaintiffs, NEPA requires the Forest Service to analyze the effects of significant logging on the roadless character of large roadless areas, but the Forest Service failed to do so with respect to the West Tucannon and Upper Cummins Creek roadless areas, each of which encompasses more than 1,000 acres. Although Plaintiffs may ultimately succeed on the merits, we hold that the district court did not abuse its discretion in denying Plaintiffs' motion for injunctive relief. We therefore affirm the district court's denial of a preliminary injunction on this ground.

Plaintiffs acknowledge, as they must, that both the West Tucannon and Upper Cummins Creek roadless areas are unin-

ventoried and that each area contains less than 5,000 acres. Plaintiffs also concede that the EIS prepared by the Forest Service extensively analyzes the effects of logging generally, includes maps disclosing the locations of the proposed logging, and mentions that logging will occur in roadless areas. Plaintiffs point out, however, that the EIS does not specifically name the West Tucannon and Upper Cummins Creek roadless areas, does not describe the precise extent of logging in roadless areas, and does not analyze the effect of logging on the *roadless character* of these areas.

**[1]** Roadless areas have been the subject of federal legislation at least since the passage of the Wilderness Act of 1964 ("Wilderness Act"), 16 U.S.C. §§ 1131-1136. In the 1970s, two massive inventorying projects—"Roadless Area Review and Evaluation" ("RARE I" and "RARE II")—were undertaken to catalogue roadless areas for possible inclusion as wilderness areas under the Wilderness Act. Designation as an "inventoried" roadless area can be a first step to designation as a wilderness area. *See generally Nat'l Audubon Soc'y v. U.S. Forest Serv.*, 46 F.3d 1437, 1439-40 (9th Cir. 1994) (describing the history of inventoried roadless areas). Although no additional large-scale inventorying projects have been undertaken since RARE I and RARE II, roadless areas that meet certain criteria continue to be designated as wilderness areas. One relevant criterion for designation of a wilderness area is the size of the pristine area: consideration is appropriate if the area "has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition." 16 U.S.C. § 1131(c).

**[2]** Consistent with that historical background, we have held that NEPA may require some consideration of the effects of logging on the roadless character of roadless areas in cases involving *inventoried* roadless areas, *Nat'l Audubon*, 46 F.3d at 1448, and uninventoried roadless areas that contain *more than 5,000 acres*, *Smith v. U.S. Forest Serv.*, 33 F.3d 1072, 1079 (9th Cir. 1994). We also have recognized that "the deci-

sion to harvest timber on a previously undeveloped tract of land is an irreversible and irretrievable decision which could have serious environmental consequences." *Nat'l Audubon*, 46 F.3d at 1448 (internal quotation marks omitted); *see also Smith*, 33 F.3d at 1079 (stating that "the decision to harvest timber in a 5,000 acre roadless area is environmentally significant"). In *Smith*, we held that NEPA requires the Forest Service, "at the very least, to acknowledge the existence of the 5,000 acre roadless area." 33 F.3d at 1079. Plaintiffs ask us to extend these holdings to uninventoried roadless areas smaller than 5,000 acres.

**[3]** It is true that significant logging of a roadless area "could have serious environmental consequences," *Nat'l Audubon*, 46 F.3d at 1448, even if the roadless area is neither inventoried nor greater than 5,000 acres. The Wilderness Act does not require an absolute minimum of 5,000 acres; it also allows for designation where the area "is of sufficient size as to make practicable its preservation and use in an unimpaired condition." 16 U.S.C. § 1131(c). The district court must carefully assess the qualities of the roadless areas in question and the extent of analysis in the EIS to determine whether the requirements of NEPA have been satisfied. On appeal from the denial of a preliminary injunction, however, we do not find a clear legal error by the district court.

Furthermore, in contrast to this case, where the Forest Service has already prepared an EIS, in *Smith* and *National Audubon* the Forest Service had not prepared an EIS and was relying on environmental assessments. We held that logging in a roadless area—even an inventoried roadless area or a roadless area greater than 5,000 acres—does not categorically require an EIS. *See Smith*, 33 F.3d at 1079 (stating that our remand in *Nat'l Audubon* was an implicit rejection of a *per se* rule, and remanding for determination by the district court);

*Nat'l Audubon*, 46 F.3d at 1448 (remanding to the district court).[3]

[4] In conclusion, Plaintiffs have failed to establish an abuse of discretion requiring reversal of the district court's denial of a preliminary injunction relating to Plaintiffs' NEPA claims.[4]

B.  *NFMA Claim*

[5] Plaintiffs' NFMA claim requires us to decide whether the term "live trees" in the applicable Forest Plan includes all trees that are not dead. We hold that it does and, therefore, reverse the district court's denial of a preliminary injunction on this ground.

Amendment 2 of the applicable Forest Plan includes a series of provisions called the "Eastside Screens,"[5] which are intended to protect old-growth forests. The relevant provision of the Eastside Screens states that no old-growth "live trees" of sufficient size may be harvested:

> 2)  Outside of LOS [late and old structural stages], many types of timber sale activities are allowed. The

---

[3]The opinion in *Smith* cited *National Audubon Society v. United States Forest Service*, 4 F.3d 832 (9th Cir. 1993). Several months after *Smith* was published, the opinion in *National Audubon* was amended to correct an unintended typographical error.

[4]Plaintiffs make several other arguments alleging violations of NEPA on the merits, but they fail to establish an abuse of discretion by the district court. Plaintiffs' arguments on the merits are not properly before us on review of a denial of a preliminary injunction. *Sw. Voter*, 344 F.3d at 918.

[5]The "Eastside Screens" were originally set forth in the Forest Service's "Environmental Assessment for the Continuation of Interim Management Direction Establishing Riparian, Ecosystem, and Wildlife Standards for Timber Sales," Appendix B, June 1995. They have since been appended to several forest plans, including the Forest Plan that is relevant here.

intent is still to maintain and/or enhance LOS components in stands subject to timber harvest as much as possible, by adhering to the following standards:

a)  *Maintain all* remnant late and old seral and/or structural *live trees ≥ 21" dbh [diameter at breast height] that currently exist* within stands proposed for harvest activities.

Eastside Screens (emphasis added).[6]

**[6]** "It is well-settled that the Forest Service's failure to comply with the provisions of a Forest Plan is a violation of NFMA." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 961 (9th Cir. 2005). The Forest Service does not dispute that it is required to comply with the Eastside Screens. Instead, the Forest Service argues that the Eastside Screens do not prohibit logging of mortally injured, "dying" trees.[7]

The School Fire EIS chose the Scott Mortality Guidelines as the method of marking trees for harvest. The Scott Mortality Guidelines are a scientific method of predicting whether an injured tree is likely to survive beyond a given amount of time, in this case, one year. Using the Scott Mortality Guidelines to select trees for harvest results in the marking of both dead trees and dying trees, that is, trees that are likely to die in the relatively near future but that have not yet died. Relying on the deposition of the Forest Service's own expert, the district court found that some trees that have not yet died have been marked for harvest in the sales areas. The parties do not challenge that finding. Accordingly, we must determine whether the Eastside Screens prohibit logging of dying trees.

---

[6]The parties agree that this provision does not apply to the harvesting of danger trees, which are defined in footnote 1, above.

[7]The Forest Service also argues that the number of trees marked for harvest that could be considered "live" is insignificant. This argument is beside the point: The Eastside Screens categorically prohibit the harvesting of "live trees."

**[7]** We apply the common meaning of the term "live trees" because neither the NFMA nor the applicable Forest Plan defines the term. *See Hells Canyon Alliance v. U.S. Forest Serv.*, 227 F.3d 1170, 1177 (9th Cir. 2000) (applying the "common meaning" of terms not defined in the statute). The common understanding of the term "live" is, quite simply, "not dead." *See, e.g.*, *Merriam Webster's Collegiate Dictionary* 29, 681 (10th ed. 1993) (defining "live" as "to be alive" and "alive" as "not dead"). Accordingly, the common meaning of the term "all . . . live trees" is all trees that have not yet died.

**[8]** A contextual clue in the Eastside Screens suggests that this common meaning was intended. The provision protects from harvest "all [old-growth] live trees [of a specified minimum size] *that currently exist*." Eastside Screens (emphasis added). The phrase "that currently exist" suggests that even trees that are expected to die within a year, but that are not dead, are still "live" because they "currently exist."[8] Applying this definition, "live trees" will be harvested, which is expressly prohibited by the Eastside Screens.

The Forest Service tries to escape this simple formulation by arguing that the term "live trees" is a technical term under-

---

[8]The Forest Service argues that the phrase "currently exist" was intended instead to make clear that it is permissible to log trees that are not yet, but would otherwise become, sufficiently large to be covered by this provision, that is, greater than or equal to 21″ diameter at breast height. But the phrase "that currently exist" modifies "trees"; for the Forest Service's meaning, the provision would say, more properly, "all trees that currently are $\geq$ 21" dbh." Moreover, the Forest Service's goal is achieved even without the phrase "that currently exist": "Maintain all . . . live trees $\geq$ 21″ dbh . . . within stands proposed for harvest activities." Eastside Screens. Under the Forest Service's reading, the phrase "that currently exist" would be superfluous, so we reject that interpretation. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (internal quotation marks omitted)).

stood by foresters to exclude dying trees and that we must defer to its technical expertise. We need not decide whether, in theory, we must employ a technical definition in a Forest Plan because there is no evidence in this record that the Forest Service adopted a technical meaning. Not only are the NFMA and the Forest Plan silent on the definition of "live trees," but neither the Forest Service nor Intervenors have cited *any* authoritative definition of the term "live trees." The Forest Service introduced evidence of a *practice* of harvesting dying trees, but that does not establish a technical *definition* of the term "live trees." Foresters very well may consider dying trees suitable for logging, but on this record we cannot conclude that they consider dying trees not "live." For example, Intervenors' expert, on whom the district court relied, testified that some "live trees" had been designated for removal; in so testifying, he was applying the common meaning of "live trees" to include trees that were not dead but that, in his opinion, had a low likelihood of long-term survival. The Forest Service is free, of course, to amend the Eastside Screens to allow logging of old-growth dying trees, either by adding a definition of the term "live trees" or by changing the requirement to maintain all live trees of a certain size. Unless and until it does so, there is no basis to adopt its proposed definition.

[9] In summary, the district court made a clear error of law, and Plaintiffs have established a very strong likelihood of success on the merits of their NFMA claim. Additionally, the resulting injury—logging of old-growth trees—is a permanent environmental injury. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."). We therefore reverse the district court's denial of a preliminary injunction on the NFMA claim and remand with instructions to grant immedi-

ately a preliminary injunction to prohibit the logging of any "live tree" 21″ diameter at breast height that currently exists in the sales areas—i.e., any tree of the requisite size that is not yet dead. In accord with the "conservative definition" of a "live tree" given by Intervenors' expert, no tree of the requisite size with green needles shall be harvested.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS. Costs on appeal are awarded to Plaintiffs. The mandate shall issue forthwith.